## PUBLIC SERVICE COMMISSION OF MARYLAND ET AL. *v.* BALTIMORE GAS AND ELECTRIC COMPANY

[No. 1254, September Term, 1977.]

*Decided November 2, 1978.*

The cause was argued before MORTON, DAVIDSON and MELVIN, JJ.

*James A. Pine* and *Kirk J. Emge* for Public Service Commission of Maryland. *Gary R. Alexander,* with whom were *John K. Keane, Jr., Donald F. Rogers* and *Philip S. Shapiro* on the brief, for People's Counsel.

*James A. Biddison, Jr.,* and *Joseph Sherbow,* with whom were *Paul W. Davis, Edward F. Shea, Jr.,* and *Sherbow, Shea & Doyle* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

By its order filed November 29, 1977, the Circuit Court for Howard County (Macgill, J.) reversed Order No. 62300 of the Public Service Commission of Maryland, dated April 22, 1977. Order No. 62300 had been filed in proceedings before the Commission known as Case No. 6792, entitled "In the Matter of Tariff, Entitled Supplement 127 to P.S.C. Md. E-6, of the Baltimore Gas and Electric Company adding to Rider 1, Fuel Rate Adjustment, the Base Cost For Nuclear Generation". It directed Baltimore Gas and Electric Company (Company) "to refund to its retail customers $31,867,000, together with an accrued interest computed at six (6) percent". Judge Macgill ruled that in the circumstances "the Commission did not have the power to order the refund in question". People's Counsel

and the Commission filed timely appeals to this Court and the Company has filed a cross-appeal.[1]

## I

On September 30, 1974, the Company filed Supplement 127 to its Electric Tariff, which would have added to the Company's existing two-part Fuel Rate Adjustment Clause a new third part providing a base cost for nuclear fuel to be used when Unit No. 1 of its Calvert Cliffs Nuclear Generating Station was to be activated as a source of electric power for its customers.

The basic purpose of a "fuel rate adjustment clause" is to enable a utility company to automatically adjust its rates currently to reflect fluctuations in the cost of fuel from the level of costs included when base rates were established at a rate hearing procedure. At the time Supplement 127 was filed, the only statutory authority for such an automatic adjustment of base rates was contained in Section 54 of the Public Service Commission Law (Md. Ann. Code, Art. 78):

"§ 54. Sliding scale of charges and dividends.

Any gas or electric company may establish a sliding scale for the automatic adjustment of charges for gas, electricity, or any service rendered and dividends to be paid to stockholders of the company. No such scale shall be effective, however, until filed with the Commission; and nothing in this section shall be construed as derogating in any respect from the paramount jurisdiction of the Commission over the rates of such companies. (1955, ch. 441.)"

---

1. In its appeal of Order No. 62300 to the circuit court the Company argued numerous reasons, in addition to lack of Commission authority, for reversal. Judge Macgill ruled against the Company on all its contentions except the one urging lack of authority to order the refund. In its cross-appeal, the Company reargues the contentions rejected by Judge Macgill. The Commission refund order has been stayed pending disposition of this appeal.

At the time Supplement 127 was filed, no Commission rule, regulation or order prescribed any standard for FRA (Fuel Rate Adjustment) clauses, nor did the broad language of the statute restrict the "sliding scale" to fuel costs. Prior to filing Supplement 127 and since 1967 the Company's FRA clause on file with the Commission provided for a two-part formula. The FRA Clause providing for a two-part formula was filed with and allowed to become effective by the Commission in 1967. The two-part formula was employed in recognition of the difference in the cost of fossil fuels for generating electricity at the Company's two newly constructed minemouth generating stations in Pennsylvania[2] as compared to the cost of fossil fuels for generation at its other plants in the Baltimore area. In 1974 the base fuel costs in the two-part FRA Clause was set at 30 cents per million Btu at the minemouth generating plants and 59.91 cents per million Btu at the company's other plants. "Fuel costs" not only included the bare cost of the fuel but also certain miscellaneous fuel-related costs in accordance with a "Uniform System of Accounts" of the Federal Power Commission[3] that was apparently acceptable to the Maryland Commission at that time. When Supplement 127 was filed with the Commission on September 30, 1974, the base cost of nuclear fuel was set at 15.66 cents per million Btu as a third part of the FRA Clause.

In the meantime, in April, 1974, in a separate proceeding (Case No. 6759), the Commission, in response to "numerous inquiries and complaints from Maryland customers of electric utility companies concerning fuel rate adjustment costs", began an investigation of the "policies and practices and factors comprising the fuel rate adjustment costs . . . charged to customers" of all Maryland electric utility companies.

As already indicated, Supplement 127 was filed pursuant to Section 54 of Code Article 78, requiring any "sliding scale

---

2. Minemouth generating stations are located at the mouth of the coal mines, thereby eliminating the cost of transporting the coal to a distant site.

3. The Federal Power Commission was abolished on October 1, 1977. Its successor is the Federal Energy Regulatory Commission under the aegis of the new Department of Energy. See Annual Report Section of *Public Utility Law* (1978), American Bar Association, p. 3.

for the automatic adjustment of charges for ... electricity"
to be filed with the Commission. Under Section 70(a) of the
Public Service Commission Law (Code Article 78), as it existed
at the time, the Commission may let the new rate go into
effect upon the date specified in the application therefor or
it may suspend the new rate for an initial period of not more
than 120 days beyond the date specified in the application.

On October 16, 1974, the Commission's Chief Engineer sent
the Commission a memorandum recognizing the "definite
consumer benefit resulting from nuclear generation included
in the FRA" and recommending that Supplement 127 be
approved subject to the Commission's final order in Case No.
6759, the generic FRA investigation. However, the Chief
Engineer questioned in his memorandum the inclusion of
certain nuclear cost elements in the clause".[4] The
memorandum did not question the use of a multi-part FRA
Clause and explained the customer benefit of Supplement 127
as follows:

> "First, some discussion is given regarding the
> benefit of the revision. Currently the cost of fuel for
> nuclear generation as compared to oil and coal costs,
> all in comparable terms of cents per million BTU, is
> about one-fourth of that for coal and about one-tenth
> of that for oil. Further nuclear fuel costs (as used
> in the FRA) will remain nearly constant for a
> 12-month period, whereas oil and coal costs change
> monthly (usually an increase). Therefore inclusion of
> nuclear generation in the FRA determination will
> have the effect of offsetting the trend in FRA
> increases. In other words including the nuclear
> generation will *not* result in a dramatic reduction in
> the FRA. As an example, assume the present coal,
> oil and nuclear fuel costs, and that nuclear
> generation is included in the FRA for the first time
> in January 1975. At that time the FRA would be

---

4. The Chief Engineer objected to the use of "Account 501, Fuel Costs",
one of the "Uniform System of Accounts" of the FPC, which had been used
by the Company for many years, with Commission approval, to determine
the elements of "fuel costs".

about 80¢ per 100 KWH with nuclear generation, and about $1.00 without. Thereafter the FRA would change up or down, with changing oil and coal prices, from the 80 cent instead of one dollar level. When Calvert Cliffs Unit No. 2 becomes operational, the FRA will undergo another 'step-down', . . . ."

On October 28, 1974, the Commission, on its own motion and acting under Article 78, Section 70, suspended Supplement 127 for a period of not more than 120 days from November 1, 1974, and instituted Case No. 6792 to consider "the justice and reasonableness" of Supplement 127. The matter was set for a hearing on November 1, 1974, before the Commission's Chief Hearing Examiner. Thus began the lengthy proceedings that culminated 30 months later in the Commission's Order No. 62300 of April 22, 1977, requiring the Company to refund $31,867,000 plus 6% interest, purporting to represent the Company's overrecovery of fuel rate adjustment charges as a result of the application of the Company's three-part FRA Clause between February 1975 (when the clause was first utilized to determine the monthly FRA charge to retail customers) and December 1976 (when the Company, pursuant to the Commission's directive in a separate generic rate case — Case No. 6985 — abandoned the three-part FRA Clause and filed a one-part FRA Clause).

In addition to the hearing on November 1, 1974, there were hearings before the Chief Examiner on January 23, 1975; February 26, 1975; August 21, 1975; and September 29, 1975. These hearings were consolidated hearings for Cases 6759 and 6792.

Following the November 1, 1974 hearing the Chief Examiner in an interim report to the Commission on December 20, 1974, recommended that the Commission "terminate its suspension of Supplement 127 . . . but retain jurisdiction to make whatever changes in the clause that may be necessary in the public interest after the hearing in this matter has been concluded". This recommendation was based in turn on the recommendation of the Commission's Chief

Engineer, who stated in a memorandum dated November 15, 1974, as follows:

"We have had occasion to analyze the subject proposal in considerable depth, including results of evaluations conducted by members of this department. There is no question that the proposed tariff revision would operate to the benefit of all customers. In order to illustrate the dimension of this benefit, it would appear that adoption of the proposed Supplement would offset the current fuel rate adjustment by approximately 20%. Since Calvert Cliffs Unit No. 1 is scheduled to commence operation sometime in January 1975, this benefit to the customers would first appear in the February 1975's fuel rate adjustment. Hence time is of the essence in order to gain the apparent consumer benefit. On the other hand, I have certain reservations as regards the manner in which the nuclear generation would be included in the fuel rate adjustment determination and also as regards the tariff base cost of 15.66¢ per million Btu as proposed by the Company.

"In conclusion, it would definitely be in the public interest for the Commission to allow Supplement 127 to go into effect on an interim basis subject to the Commission's findings in Case No. 6792. In this manner the customers of the Company would receive the total benefit as provided in the subject Supplement. It is therefore further suggested that the effective date for Supplement 127 to become operative on an interim basis should be on/or before January 1, 1975, as the Company determines its fuel rate adjustment on a calendar month basis and its first nuclear generation is scheduled for the month of January 1975."

Thereafter, on December 23, 1974, by its Order No. 61065,

the Commission terminated the suspension of Supplement 127. The termination order, in pertinent part, reads as follows:

"WHEREAS, the Commission is of the opinion and so finds that it would be in the public interest to terminate the suspension at this time, subject to such *future* modifications in the proposed Supplement 127 as may be desirable based on evidence deduced after full hearing. (Emphasis added.)

"IT IS, THEREFORE, this 23rd day of December, in the year Nineteen Hundred and Seventy-four, by the Public Service Commission of Maryland,

"ORDERED: (1) That the suspension of Supplement 127 to Tariff P.S.C. Md. E-6, filed by Baltimore Gas and Electric Company, imposed by Order No. 61006, entered in this proceeding on October 28, 1974, be, and the same is hereby, terminated.

(2) That the Commission retains jurisdiction to require such modifications in Supplement 127 to Tariff P.S.C. Md. E-6, filed by Baltimore Gas and Electric Company, as may be determined after the hearing in this matter has been concluded."

On January 23, 1975, the Commission, at the Company's request, accepted Supplement 132 (reducing the period of calculation of the fuel rate adjustment from 12 months to 3 months) for Supplement 127, permitting it to take effect with February 1975 billings, subject to the same condition that was attached to Supplement 127, i.e., "that the Commission retains jurisdiction to require such modifications as may be determined after hearing in this matter has been concluded".

On February 4, 1975, People's Counsel filed a Petition for Fuel Rate Adjustment Relief in Case No. 6759, the generic FRA proceeding that was the companion case to Case No. 6792, seeking among other things, a ruling that in calculating the monthly FRA the cost of fossil fuel (coal, oil, gas) should include no items other than those specified in Account 151 of the Uniform System of Accounts. At that time Maryland electric utilities calculated the FRA on the basis of Accounts

501 and/or 547. Account 501 included 15 items, whereas Account 151 was limited to the actual cost of fossil fuel plus the cost of transportation for fuel.

On February 24, 1975, the Commission issued Order No. 61148 in Case No. 6759 (the FRA generic case) which directed the Company and all other electric companies having FRA Clauses based on Account 501 of the Uniform System of Accounts to, *in the future,* beginning with the billing month of April 1975, calculate their monthly adjustments so as "to limit the excess cost of fuel to be recovered to the items included in Account 151 of the Uniform System of Accounts prescribed by this Commission". The Commission made no attempt to order refunds or make retroactive adjustments to charges that had previously been collected on the basis of Account 501.

On March 21, 1975, in response to Order No. 61148, the Company filed Supplement 135 to its Electric Service Tariff to replace Supplement 132. By this filing the Company proposed to change the base costs of fossil fuels in its three-part clause: The base cost of fuel per million Btu for minemouth generating stations was changed from 30 cents to 28.69 cents and for its other fossil fuel stations from 59.91 cents to 59.27 cents. As Order No. 61148 did not apply to nuclear fuel costs, Supplement 135 retained the previously established base cost of 15.66 cents per million Btu for that fuel as part of the three-part formula for determining the monthly FRA.

The Commission, by letter to the Company, dated April 1, 1975, approved the proposed change in the Company's tariff. The letter from the Executive Secretary of the Commission stated:

"We have received the tariff, entitled Electric Supplement 135 to P.S.C. Md. E-6, filed with the Commission on March 21, 1975, by Baltimore Gas and Electric Company pursuant to Commission Order No. 61148 entered on February 24, 1975, in Case No. 6759.

"The Commission has directed me to advise you that it has reviewed the aforesaid tariff and

determined that it should be permitted to become effective with April, 1975 billings."

Thus, Supplement 135, which obviously contemplated the continued use by the Company of a multi-part FRA Clause, was approved by the Commission and "permitted to become effective" without suspension or any other condition. Thereafter, the Company, as it had in the past, continued to file with the Commission monthly "FRA letters" showing precisely how it calculated its monthly FRA charges using its three-part formula.

In the meantime, on February 5, 1975, the Commission solicited programs from eight certified public accounting firms for "an indepth, independent and competent review . . . of the practices and procedures of the four principal generating companies in Maryland [including Baltimore Gas and Electric Company] in order to develop the factual situation with regard to the fuel rate adjustment clause as applied to customer billing by each utility". The firm selected was to formalize the results of its review, analysis and recommendations "in a document suitable for submission" in the hearings in the Commission's on-going investigation of FRA costs charged to customers of all Maryland electric utility companies (Case No. 6759), and to serve as an expert witness in these hearings.

The Commission picked the firm of Haskins & Sells, who on July 11, 1975 filed its report with the Commission. The report concluded that the use of a multi-part FRA Clause, such as had been employed by the Company and accepted by the Commission since 1967, "does not give consideration to the relative generating mix which produced current costs". The effect of this failure to "give consideration to the relative generating mix" was to allow the Company to recover each month, as part of its FRA charge to its customers, *some* of the fixed costs associated with the construction of the Calvert Cliffs nuclear plant. This effect resulted from the methodology used by the Company in calculating the monthly FRA charges under the Company's multi-part FRA Clause. As nearly as we can determine from the record the same

methodology had been used by the Company and accepted by the Commission since 1967. When the base cost of nuclear fuel was added, the method of calculating the FRA charges was the same as it had been since 1967; the only change being that instead of a two-part clause there was now a three-part clause.

How the "relative generating mix" is overlooked by using a multi-part FRA Clause and results in an overrecovery of fuel costs was explained in the Haskins & Sells report as follows:

### "Multiple Part Clause and Nuclear Generation

The Company's fuel adjustment clause employs, effective January 1, 1975, a three part formula, whereby nuclear, minemouth and other generation are given separate consideration. Each part of the formula uses a separately stated 'base fuel cost' for each of the three types of source generation. The 'base fuel cost' for each source of generation is compared to the current cost of fuel to determine the increase or decrease above or below base fuel cost which will be a billing determinant under the fuel adjustment clause. We believe the three part formula, as presently used, does not give adequate consideration to the base fuel cost included in base rates.

The Company, by letter dated February 20, 1975, indicated to the MPSC that the average base cost of fuel was 54.79¢ per million Btu for the twelve months ended July 31, 1974 (test year in last rate case) and that this average base cost was included in base electric rates. Such base fuel costs were related to the generating mix experienced by the Company for such test year.

However, the three part formula presently in use does not give consideration to the relative generating mix which produced current costs as can be seen from the following example.

Assume that during the test year of a rate case the output of Source A and B was weighted 50%-50% and that the base cost was 1¢ for Source A and 1.2¢ for Source B. The cost included in the determination of base electric rates therefore would be determined as follows:

| Source | Base Unit Cost | Test Year Output | Test Year Cost |
|--------|------|------|------|
| A | 1¢ | 1,000,000 | $10,000 |
| B | 1.2¢ | 1,000,000 | $12,000 |
| Total | | 2,000,000 | $22,000 |
| Average Cost | | | 1.1¢ |

Assume that subsequent to the test year the facts above remained the same except that the output from Source A was 1,500,000 and Source B was 500,000. The costs are therefore as follows:

| Source | Current Unit Cost | Test Year Output | Test Year Cost |
|--------|------|------|------|
| A | 1¢ | 1,500,000 | $15,000 |
| B | 1.2¢ | 500,000 | 6,000 |
| Total | | 2,000,000 | $21,000 |
| Average Cost | | | 1.05¢ |

When the generating mix changes the average cost can go either up or down (down in the above example). In the above example the average cost of 1.1¢ would have been included in base electric rates for the current year. Since the 'current unit cost' is equal to the 'Base Unit Cost' on a Source by Source basis, the two part fuel adjustment clause would reflect no adjustment even though the average 'current year cost' has decreased.

The 'base fuel cost' for one million Btu's of output from the nuclear plant was established at 15.66¢ which is the current cost of this fuel. Because this 'base fuel cost' is less than the 'base fuel cost' of

54.79¢ included in base electric rates mentioned above, it would appear that the Company is overrecovering fuel costs for energy generated by its Calvert Cliffs Unit 1 nuclear plant."

Thus the use by the Company, in calculating its monthly FRA charges, of a separate base cost for fuel used at each of its three types of generating plants (nuclear, minemouth and other stations) rather than an actual average cost of fuel used in the aggregate at all its generating stations, was found by Haskins & Sells to be inappropriate and to result in an "overrecovery" of fuel costs in the case at hand. The record shows, nevertheless, that the Company's use of the comparably cheaper nuclear fuel resulted in savings to its customers of approximately 4 million dollars per month — even though the savings were calculated in accordance with its three-part FRA Clause using the same methodology that the Commission had been accepting since 1967.

The appellants concede that "the Supplements in question would act to lower by some amount the fuel rate adjustment revenues collected under the then-existing fuel rate adjustment clause." They contend, however, that the use of the multi-part FRA Clause, taking into account the cheaper nuclear fuel, does not lower the FRA charges as much as they would have been lowered had the Company's formula taken into proper consideration the "generating mix" of the three sources of electric generation. Thus, they argue, to the extent that the formula fails to properly consider the "generating mix", an "overrecovery" of fuel costs results which permits the Company to use the overrecovery to recover part of the fixed costs of constructing the nuclear plant, and that these fixed costs can properly be recovered only in a generic rate proceeding and not through collections under an FRA Clause.

In its July 11th report and in subsequent testimony before the Chief Examiner, Haskins & Sells make it clear that although the Company's multi-part FRA Clause enabled it to recover part of the fixed costs of the nuclear plant, it was not recovering twice for these costs, i.e., through its base rates

set in its last rate case (using the test year ending July 31, 1974) and also through FRA revenues. The report stated:

"... [W]hile there may be overrecovery of fuel costs from nuclear generation, we recognize that the fixed costs of nuclear generating units are significantly in excess of similar costs for fossil units and, therefore, base electric rates do not provide for this increased cost of producing energy. *We assume that in accepting the Company's 15.66¢ MBTU for nuclear generation the MPSC considered this to be an offset to the increased fixed costs which will not be recovered until new base rates are established in a rate proceeding.* This procedure does not result in a precise offset of the two types of cost and we recommend that when a nuclear or any other new plant goes into operation, the fuel adjustment formula recover only the cost of fuel used for producing energy sold. This will be accomplished only by using the one part formula. However, we wish to point out that in adopting this procedure, the Company must receive an immediate increase in base rates when a major generating station is placed in service if the fixed costs per kw of capacity is significantly higher than the related embedded fixed costs if it is to be treated in an equitable manner." (Emphasis added)

In addition to recommending a one-part FRA Clause, Haskins & Sells recommended numerous other specific changes in the structure of the Company's existing FRA Clause.

By letter dated July 18, 1975, Haskins & Sells responded to a Commission request to quantify the amount of overrecovery of fuel costs. The letter stated:

"We did not report a dollar amount of overrecovery of fuel costs because equity would require consideration of the increased fixed costs of the nuclear plant and we had assumed the MPSC had considered this in allowing the use of the 15.66¢ per

MBTU base. In addition, the calculation of an amount of overrecovery is subject to a great many assumptions, similar to the effects of changing levels of interchange energy discussed on page 9 of our report. Because of the imprecision of any amount calculated and our conclusion that the Company had not earned amounts equal to the allowed rate of return granted by the MPSC in their last rate proceeding, our recommendation was that the mechanics which cause the problem be corrected without attempting to quantify all past imprecisions. We continue to believe this to be the most equitable treatment for the Company and its customers for resolving the issues we have raised in our report."

Nevertheless, to comply with the Commission's request Haskins & Sells calculated the overrecovery between January 1975 and March 1975 to be $1,386,000. The letter concluded with this paragraph:

"We wish to emphasize that this calculation is limited to one issue raised in our report and is subject to much speculation as to how it should be calculated. In addition, as we mentioned in our report the consideration of the increased fixed costs should be considered on an on-going basis."

On July 24, 1975, the Commission issued an order in the consolidated cases (Cases Nos. 6759 and 6792) directing the Company to show cause why the specific recommendations of Haskins & Sells should not be implemented and "why $4,676,000,[5] plus such additional amounts as may accrue, representing over-collections from customers through the operation of the present fuel rate adjustment clause, should not be refunded to its customers . . . ."

On July 31, 1975, the Company filed a response to the Commission's Show Cause Order denying that any overcharge had occurred. The response further stated that the Company did not object to the specific recommendations

---

5. Representing the alleged "overcollection" through June 1975.

of Haskins & Sells, including replacing its three-part FRA Clause with a one-part FRA Clause, "provided that (1) such action applies prospectively and not retroactively and (2) the Commission also implements the [Haskins & Sells] Report's correlative recommendation ' ... that in adopting this procedure [replacing a three-part Clause with a one-part Clause], the Company must receive an immediate increase in base rates when a major generating station is placed in service if the fixed costs per kw of capacity is [sic] significantly higher than the related embedded fixed costs if it is to be treated in an equitable manner' ".

Two hearings were thereafter held before the Chief Examiner, on August 21, 1975, and September 29, 1975, in consolidated Cases Nos. 6759 and 6792. Nearly one year later, on September 17, 1976, the Chief Examiner issued a proposed order in Case No. 6792. The Chief Examiner, contrary to the Company's contention, ruled that "under Section 70 of the Public Service Commission Law and effective orders of the Commission ... refunds could be required as a matter of law ...." The Chief Examiner found, however, that the "factual circumstances present in this proceeding" do not warrant refunds. He carefully set forth "the factual circumstances", noting in his proposed order a "number of important factors to consider" in regard to the issue of a refund:

1) The fact that the fixed costs of the nuclear plant were four times the embedded costs of the Company's other plants upon which rates were set in the Company's 1974 rate case.

2) The fact that rates set in the Company's last generic rate case (Case No. 6851) were based on a test year ending August 31, 1975, and only gave "limited recognition" to "the significantly greater investment" in the nuclear plant.

3) The fact that even with the revenues from the "overrecovery" the Company was not earning the rate of return authorized by the Commission in Case No. 6851, and that "a refund would lower the

effective rate of return during the past period involved even if, in reality, it were amortized over a future period."

4) "The estimated annual customer savings under the [FRA] clause now in effect was about $48,000,000 for 1975 ... and an additional $28,000,000 for the first seven months of 1976".

The Chief Examiner concluded as follows:

"In reviewing the total picture of Company past earnings, the extent of the savings to customers under the present fuel adjustment clause and having in mind the basic purpose of regulation to achieve just and fair results, the Examiner believes that any refund would be shortsighted and impair to some degree, for the long-haul, the financial ability of the Company. The Examiner also believes that it would not be in the ultimate public interest to order refunds and that the very high investment in plant to provide the lower cost operation should be given simultaneous recognition. Finally, it should be noted that the fixed and operating costs of nuclear generation will be less than those for equivalent fossil fuel capacity.

The Examiner finds that under Section 70 of The Public Service Commission Law and effective orders of the Commission that refunds could be required as a matter of law, but that the factual circumstances present in this proceeding do not require that any additional past benefit be passed on to customers. The Examiner further finds that the one-part clause as recommended by Haskins & Sells should be filed with the Commission to become effective with the effective date of any revised rates authorized in Case No. 6985, now pending before the Commission or at such other date as may be determined by the Commission in that proceeding."

On September 27, 1976, People's Counsel filed an

administrative appeal from the Chief Examiner's proposed order to the full Commission.

On December 9, 1976, the Commission concluded the Company's generic rate case (Case No. 6985) that had been instituted with the Company's application, in May 1976, for a $93,900,000 increase in its electric, gas and steam base rates. The Commission noted that the Company "has been consistently unable after every rate case, to earn its authorized rate of return". In addition to granting an increase in electric base rates, the Commission directed the Company to file a one-part FRA Clause, to be effective with the new rates being authorized. On December 15, 1976, the Company filed Supplement 145 implementing the Commission's directive to file a one-part FRA Clause to replace Supplement 135 to be effective with service rendered on or after December 20, 1976.

On April 22, 1977, the Commission issued Order No. 62300, which is the subject of this appeal, requiring the Company to refund to its retail customers $31,867,000, plus 6% interest, representing the calculated overrecovery of fuel costs between February 1975 and December 1976.

## II

As pointed out by the Court of Appeals in *Public Service Commission v. Baltimore Gas and Electric Company,* 273 Md. 357, 362, 329 A. 2d 691 (1974), "a reviewing court will not substitute its judgment for that of the Commission, a body informed by experience and aided by a competent and experienced staff, and ... consequently an order of the Commission will not be disturbed on appeal except upon clear and satisfactory evidence that it is unlawful or unreasonable."

The trial court held that the Commission had no authority to order refunds. Judge Macgill based the decision on his interpretation of Section 70 of Article 78, which at all pertinent times in this controversy read as follows:

"*§ 70 Suspension of rates.*

*(a) Suspension of proposed new rate; effective*

*date of rate where not suspended.* — The Commission may suspend, effective forthwith, and without formal proceedings any new rate proposed by a public service company. In such case, the Commission shall furnish to the proponent of the rates suspended a statement, in writing, of the reasons for such suspension. Unless so suspended, any new rate or change in rate proposed by the public service company, shall, subject to § 27 (c) of this article, go into effect upon the date specified in the application.

*(b) Proceedings as to justice and reasonableness of rates suspended; duration of suspension.* — The Commission shall promptly institute proceedings as to the justice and reasonableness of the rate suspended. The suspension may be initially for a period of not more than 120 days beyond the time when the rates would otherwise go into effect; and if the Commission finds that the proceedings cannot be completed within the period of the initial suspension, it may extend the suspension for an additional thirty days. After the expiration of 120 days or 150 days, as the case may be, if no final order has been entered by the Commission, the new rate or change in rate shall go into effect, subject to subsection (c) of this section.

*(c) Where rate goes into effect before final order in proceedings.* — If a proposed new rate or change of rate effecting an increase goes into effect before a final order is entered in the said proceedings, the Commission may, where practicable, order the proponent to keep a detailed and accurate account of all amounts received by reason of such new rate or increase, and the persons on whose behalf such amounts are paid, and after the conclusion of said proceedings, require the proponent to refund, with interest, to every such person, such part of the new or the increased rates as the Commission finds unjustified. If such refund is not practicable, the

company shall charge off and amortize, by means of a temporary decrease, to be fixed by the Commission, below the rates as finally determined, for such period as the Commission may determine, the difference between the operating revenues under the rates charge [charged] and the operating revenues that would have been obtained from the same volume of business from the rates as finally determined."

Judge Macgill found that Supplements 127 and 132 "constituted a change of rate which did not effect an increase within the meaning of Section 70 (c)". He therefore concluded "that the Commission did not have the power to order the refund in question". We do not agree that Supplements 127 and 132 did not effect an increase in the monthly FRA charges to the Company's customers.

Had no change in the FRA Clause been permitted to go into effect, the Company would have been required to use its existing two-part Clause in calculating its monthly FRA charges. That two-part Clause provided "base costs [of fuel] per million Btu of 30¢ at mine-mouth generating stations and 59.91¢ *at other generating stations*". (Emphasis added) The Calvert Cliffs nuclear generating plant would have been included as one of the "other generating stations". Necessarily, the cheaper cost of nuclear fuel would have been included in calculating the costs of fuel at those "other generating stations", and a lower FRA would have resulted. It is true that Supplements 127 and 132, with the lower cost of nuclear fuel as a separate base cost, also resulted in lower FRA charges, but not as low as if there had been no change at all from the existing two-part clause. As stated by Mr. Peter Karpoff, Staff Director of the Maryland Council of Economic Advisers:

"... There are substantial fuel cost savings available from nuclear generation, and the Company's proposal passes some of these savings along to customers, but the effect of the Company's proposed FRA revision is to reduce the saving experienced by

customers to about 75 percent of that anticipated without change".

Under the circumstances, therefore, we think it was error for the trial court to hold that Supplements 127 and 132 did not "effect ... an increase" within the meaning of Section 70 (c) of the Public Service Commission Law. We hold that the Supplements did effect an increase in rates and since they went into effect "before a final order ... [was] entered in the ... proceedings", after having been once suspended, the Commission had full authority to require the Company "to refund, with interest, ... such part of the ... increased rates as the Commission finds unjustified".

In its cross-appeal, the Company does not challenge the implied power of the Commission to lift the suspension of Supplement 127 prior to termination of the statutory period contained in Section 70 (b), nor does it contend that when Supplement 127 went into effect after the suspension was lifted before a final order in the proceedings, it would not ordinarily be subject to the refund provisions of Section 70 (c). The Company does contend, however, that in this case the wording of the order terminating the suspension (Order No. 61065, quoted *infra)* precluded the Commission from exercising its power to require refunds. The Company argues that because the order makes no "reference, express or implied, to retroactive refunds of charges collected under the Supplement" the Commission "retained jurisdiction" only for the purpose of possibly modifying the Supplement prospectively and not for the purpose of requiring refunds. The argument is without merit and was fully answered by Judge Macgill in his opinion filed below:

"... If the circumstances were such that the Commission had the authority under the provisions of the statute to order a refund, it retained the jurisdiction to do so, regardless of the wording of its orders. This is so because the provisions of the statute are self-operative; it provides that if the new rate or change in rate goes into effect before a final order, it shall be subject to the provision

for refund in subsection (c). The new rate or change in rate in this case did go into effect before the final order and it therefore automatically became subject to the provisions of subsection (c), regardless of the fact that the Commission neglected to refer to, or quote, the statutory language in its orders. It did not, and could not, abdicate its statutory power simply by omitting to mention it."

The Company further contends that when Supplement 132 was substituted for Supplement 127 it was allowed to become effective without suspension and therefore was not subject to the refund provisions of Section 70 (c). We find no merit in this contention. The order (Order No. 61103) permitting Supplement 132 to become effective recited the fact that Supplement 132 proposed "to change the [FRA] clause so that the 'millions of Btu per kwh of sales' is determined for the 3 months ended with the preceding month instead of 12 months" as provided by Supplement 127. The operative language of the order reads as follows:

"IT IS, THEREFORE, this 23rd day of January, in the year Nineteen Hundred and Seventy-five, by the Public Service Commission of Maryland,

ORDERED: (1) That the caption in this proceeding is amended so as to change the identity of the Supplement from 127 to 132.

(2) That Supplement No. 132 to Baltimore Gas and Electric Company Tariff P.S.C. Md. E-6 be, and the same is hereby, permitted to become effective with February 1975 billings.

(3) That Supplement No. 132 be substituted as a subject of hearing now pending in Case No. 6792.

(4) That the Commission retains its jurisdiction to require such modifications in Supplement No. 132 to P.S.C. Md. E-6, filed by Baltimore Gas and Electric Company on January 8, 1975 as may be determined after the hearing in this matter has been concluded."

Under the circumstances, we agree with Judge Macgill that the fact that there was no specific suspension order regarding Supplement 132 is immaterial. Like Supplement 127, its substitute, Supplement 132, was subject to the refund provisions of Section 70 (c). It is not disputed that the "overcollection" under Supplements 127 and 132 amounted to $459,430 for the two months (February and March, 1975) they were in effect. In our view this sum is the maximum amount that was subject to the Section 70 (c) refund provisions. All other alleged "overcollections" occurred after Supplement 135 became effective with April 1975 billings.

As already pointed out, when Supplement 135 was filed with the Commission on March 21, 1975, the Commission, unlike its action regarding Supplements 127 and 132, did not suspend the rates that would result from the application of the FRA Clause contained in Supplement 135. Therefore, pursuant to Section 70 (a), Supplement 135 automatically went into effect "upon the date specified in the application". Not only did Supplement 135 go into effect by force of the statute, but by specific Commission approval as well, as witnessed by the Commission's letter, dated April 1, 1975, telling the Company that the Commission "has reviewed the aforesaid tariff and determined that it should be permitted to become effective with April, 1975 billings". Having become effective, without ever being suspended, the income realized from the application of the rates provided by Supplement 135 was not subject to refund. To order such a refund would be without any statutory authority therefor and would amount to the forbidden practice of retroactive rate making. *See, e.g., Spintman v. Chesapeake & Potomac Tel. Co.,* 254 Md. 423, 255 A. 2d 304 (1969) and *Indiana Tel. Corp. v. PSC,* 171 N.E.2d 111 (1960). In denying that the Indiana Commission had the authority to retroactively require refunds, the Indiana Appellate Court said, *id.* at 124:

> "We are satisfied that no utility could attract capital for expansion or replacement of its property and facilities, or for any other purpose, if the Commission could at one time fix rates for that utility and then at some later time rescind those

rates retroactively, fix lower rates retroactively and require the difference to be refunded to the ratepayers. The law of Indiana was not designed or intended to create chaotic conditions in the market where utilities, as well as other businesses go to obtain capital for their legitimate business purposes."

## III

Having determined that the Company's "overrecovery" under Supplements 127 and 132 of $459,430 was subject to the refund provisions of Section 70 (c), there remains for consideration the Company's contention that Order No. 62300 requiring it to make refunds to its customers was not supported by substantial evidence and was arbitrary and capricious. Here again we think Judge Macgill has fully answered this contention and we adopt his opinion thereon as follows:

"The Company asserts that Order No. 62300 requiring it to make refunds to its customers was not supported by substantial evidence and was arbitrary and capricious. The reason it puts forth for this assertion is that no witness, not even the expert witness of the Commission, Haskins and Sells, testified that, under the circumstances, a refund should be ordered. This Court thinks that this contention confuses the evidence with the action to be taken on it. The Commission certainly had before it substantial evidence on which to base a finding that the Company had over-recovered its fuel costs under the three-part fuel rate adjustment clause. It was peculiarly within the province of the Commission to decide what action it should take on the basis of the finding and it was not bound to follow a policy recommendation by its expert witness or by Mr. Stringer [The Chief Examiner]. *Public Service Commission v. Baltimore Gas and Electric Company*, 273 Md. 357, 373 (1974), *Potomac Edison*

*Company v. Public Service Commission,* 279 Md. 573, 584 (1977)."

*See also Dept. of Nat. Res. v. Linchester,* 274 Md. 211, 334 A. 2d 514 (1975), where Judge Digges, speaking for the Court, said at 224:

" ... This power of review [of decisions of administrative agencies], whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. *In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries ....* " (Emphasis added.)

The power of the Commission to fix reasonable rates is legislative in character, *Bosley v. Dorsey,* 191 Md. 229, 60 A. 2d 691 (1948), and under the statutory scheme contained in § 70 of the Public Service Commission Law, we think the Commission was acting "within its legal boundaries" in ordering refunds of the "overrecovery" of FRA charges generated by proposed Supplements 127 and 132, *i.e.,* $459,430. The wisdom of such an order in the face of general rate increases granted to the Company subsequent to the "overrecoveries" and prior to the refund order is not for us to decide.

The Company's final contention is that the Commission's delay in deciding the refund issue was "arbitrary and capricious, prejudicial to [the Company] and therefore unlawful and unconstitutional". We agree with Judge Macgill that, "while the delay was substantial, this court is not persuaded that its effect amounted to a denial of the Company's constitutional rights". Moreover, the prejudice argument was directed to the fact that "the amount of the potential refund climbed as the months passed". In view of our decision that the refund order is restricted to

"overrecoveries" of only two months, the argument loses whatever validity it ever had.

## Conclusion

We conclude that insofar as the Commission's Order of April 22, 1977, directs the Company to refund $31,407,570, it is void and of no effect, but insofar as the Commission's Order directs the Company to refund $459,430 it should be affirmed.

*Judgment affirmed in part and reversed in part.*
*Costs to be paid by appellants.*