# WALLER *v.* PUBLIC SERVICE COMMISSION OF MARYLAND ET AL.

[No. 223, September Term, 1971.]

*Decided March 17, 1972.*

112

The cause was argued before HAMMOND, C. J., and
BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Bayard Z. Hochberg,* with whom were *Sigmund Levin*
and *Levin, Hochberg & Chiarello* on the brief, for appellant.

*Daniel B. Leonard,* with whom was *William D. Rafferty*
on the brief, for Patuxent Water Company, Inc., one of
appellees and *J. Edward Davis,* Counsel for Public Service Commission, on the brief for the Commission, other
appellee.

FINAN, J., delivered the opinion of the Court.

The appellant, Harry Waller, is the owner of a 102
unit apartment complex and gasoline service station in
Lexington Park, St. Mary's County. While his sewage
and water services were supplied by the Patuxent Water
Company, Inc. (Patuxent), an appellee, his monthly rate
was $8.50 for each unit. However, after the St. Mary's
County Metropolitan Commission (Metropolitan), another appellee, purchased Patuxent, Waller received a
new schedule of rates wherein the charges rose as high
as $20 to $25 per apartment unit. When Patuxent filed
its application for the sale to Metropolitan with the Public Service Commission of Maryland (PSC), another appellee, the appellant along with others protested the approval raising many issues, some of which will be subsequently discussed. Being dissatisfied with the order of
the PSC which approved the sale and with its affirmance
by the Circuit Court of Baltimore City (Perrott, J.), to
which court the case had been transferred for hearing,
Waller appealed.

The main thrust of the appellant's challenge to the orders of both the PSC and the court below is that the PSC

excluded as irrelevant, evidence as to the reasonableness of the purchase price of $650,000 which Metropolitan paid to Patuxent for its property, assets and franchise. This objection was raised on the theory that the purchase price paid for Patuxent will eventually reflect itself in the rate base of Metropolitan and, if excessive, will inevitably result in unwarranted increases in water and sewage rates payable by Patuxent customers. See Pond, *Public Utilities* (4th ed.), § 450, at 791.

An issue was also raised regarding a per annum increase from $22,400 to $80,000 in the charge made by Metropolitan to Patuxent for treating the sewage of Patuxent. This latter item was the subject of litigation as the result of an equity suit filed by Metropolitan against Patuxent to collect these rates. However, this suit was settled by an agreement between the parties at the time of the consummation of the sale of Patuxent to Metropolitan.

The appellant finally raises the issue that the PSC erred in refusing to include in its order approving the sale some safeguard to protect Patuxent's old customers against excessive charges and increases in their rates by Metropolitan.

Patuxent is a privately owned "public service company" and as such is subject to regulation by the PSC which of course includes the regulation of its rates. Code (1969 Repl. Vol.), Art. 78, §§ 23, 24 and 27. When the present litigation began in 1970, Patuxent was furnishing water to, and collecting the sewage of, some 800 customers within a two mile radius of the Patuxent River Naval Air Station (Naval Air Station) near Lexington Park. The Naval Air Station had its own sewage collection system and a sewage plant, which until July 1, 1969, treated its own sewage and the sewage collected by Patuxent for which it charged the latter $24,000 per year. Patuxent, although having a water plant, had no sewage treatment plant of its own.

Metropolitan is a public body corporate created by

Chapter 816 of the Laws of 1957, which is codified as Sections 157 to 180 of the St. Mary's County Code. Without detailing its powers and authority, it suffices, for the purpose of our consideration, to state that it had the legal authority to acquire Patuxent. At the time of this purchase Metropolitan had a sewage treatment plant, pumping stations and main interceptors in various regions of the Mattapany Sanitary District, which it had created and which embraced Patuxent's service area.

At the hearing before the PSC in July of 1970, Metropolitan introduced testimony to show that it had embarked on a total water and sewage project which would cost around 8 million dollars, part of which was to be financed by its general obligation bonds, but the substantial portion of which would come from Federal and State grants. Metropolitan's evidence further showed that its secondary treatment plant had reduced the pollution going into the Chesapeake Bay from this area to about one-sixth of what it had been. The Naval Air Station's treatment plant, which Patuxent had used, had only been a primary one. Metropolitan further established its intent to perform all of the services formerly rendered by Patuxent. It also presented testimony to show that the Patuxent purchase was negotiated by way of an arm's length transaction which had been approved by the County Commissioners of St. Mary's County. It is most important to keep in mind that Metropolitan is not under the jurisdiction of the PSC. See Ch. 816, Laws of 1957, §§ 180, 182, 185, 187 and 188.

It is obvious from reading the record, as well as the appellant's brief, that it was his purpose to demonstrate that a highly questionable "deal" had transpired with regard to the purchase of Patuxent by Metropolitan. He further hoped to show interlocking relationships by individuals interested in the operation of both Patuxent and Metropolitan and the establishment of arbitrary and unregulated rates made necessary through the excessive values placed on Patuxent. The appellant emphasized that

Mr. E. Edward McLean, Chief Auditor of the PSC, testified that the book value of Patuxent, less depreciation, was $328,763 as of December 31, 1969, and that the value of the company on an original cost basis of the utility plant was $505,091 and the net depreciated value was $274,415. In contrast to this, it should be noted that Mr. Benjamin B. Bevan, a reputable civil engineer retained by Metropolitan, testified that the reproduction cost of Patuxent would be $586,000. All of this makes interesting reading but strays from the point made by both the PSC and the lower court, that the PSC, having no control over the establishment of the rates by Metropolitan, cannot meaningfully investigate the cost of Patuxent to Metropolitan. The only issue with which the PSC should properly concern itself would be whether the public interest would best be served by the purchase of Patuxent by Metropolitan. Code (1969 Repl. Vol.), Art. 78, §§ 24, 75 (a) and 84 (a).

The PSC, in considering the public interest aspect of the sale of Patuxent to Metropolitan, found that it was in the public's interest to approve the sale, stating:

"The record shows, and there is no contention otherwise by any party, that the physical plant of Patuxent is not in the best of condition. * * * From our own knowledge, having exercised jurisdiction and continuing surveillance over the operations of the company since its origin we are aware that material improvements to the physical plant are needed. The water system has reached the limits of its capacity and needs additional storage facilities. The Metropolitan Commission plans to install such additional capacity. Patuxent would have to install the needed storage plant if sale is denied, and the additional investment might require an increase in water rates. Every utility is entitled to a fair return upon its investment.

With respect to the sewage collection system,

certain lines are in need of rehabilitation, which cost would increase the existing loss from this part of the service. * * *

The present service of Patuxent appears to be satisfactory but the question is will it continue to be so. The franchised area is completely surrounded by Metropolitan so no expansion or growth can be anticipated. With rising costs this will inevitably lead to either higher rates or a deterioration of service.

* * *

The St. Mary's County Metropolitan Commission was created by law to provide a modern water and sewerage system in St. Mary's County and it is doing just that. Pollution is being reduced, and the entire community will benefit. This Commission can not impede progress that is in the public interest. On the basis of the record this Commission is of the opinion that the Metropolitan Commission is fully capable to render water and sewerage services equal, if not superior, to those of Patuxent."

We are of the opinion, as was Judge Perrott below, that there was substantial evidence on the record considered as a whole to support the finding of the PSC that the contract of sale was in the public's interest and should be approved. See *Brotherhood of Railroad Trainmen v. Baltimore & Ohio R. R. Co.*, 248 Md. 580, 598, 238 A. 2d 516 (1968); *Howard Sports Daily, Inc. v. Public Service Commission*, 179 Md. 355, 364, 18 A. 2d 210 (1941); Code (1969 Repl. Vol.), Art. 78, § 84 (a), entitled "Burden of Proof."

The PSC having made a finding as required of it under Article 78, § 75 (a), there was nothing further left for it to consider. Indeed, had it gone beyond its finding of whether the sale was "in the public interest" it would have violated Section 97 of Article 78, entitled, "Scope of Review," as being " (2) not within the statutory authority or jurisdiction of the Commission, * * *."

The issue raised by the appellant regarding the per annum increase from $22,400 to $80,000, which Patuxent had to pay to Metropolitan, involves the sewage charge made after Patuxent could no longer avail itself of the use of the Naval Air Station sewage disposal plant when that facility ceased operation prior to July 1, 1969. Metropolitan filed an equity suit (Equity No. 3455) in the Circuit Court for St. Mary's County, almost immediately after it commenced service to Patuxent in an effort to obtain a court order to enforce this charge. This case apparently gave impetus to the negotiations for the purchase of Patuxent and its settlement was a part of the purchase agreement. The settlement of this equity case was made contingent upon the PSC approval of the sale. Here, again, the PSC, although having jurisdiction over the rates that Patuxent might pay or charge for service, had no control over the rates charged by Metropolitan. This, the PSC and all others concerned recognized as an anamolous situation.

At the hearing before the PSC it did not allow the explanation in detail as to how Metropolitan arrived at the $80,000 charge, as it thought this matter was beyond its concern. The PSC's feeling about the position which it took on this point was no doubt strengthened by its knowledge that the dispute involving the $22,400 *vis a vis* the $80,000 charge was formally before the Circuit Court for St. Mary's County and the knowledge that the amount of this charge eventually became a bargaining item in the purchase negotiations. Considering the totality of these circumstances we cannot fault the PSC's actions regarding this disputed charge. We would note in this regard that the PSC was quite aware that it had jurisdiction over Patuxent until it rendered its order approving the sale, as is evidenced by the fact that among its findings it held that the "charges for utility services for the quarter beginning July 1, 1970, and ending September 30, 1970, shall be billed by Patuxent at the rates on file with this Commission."

The last contention made by the appellant is almost

precatory in nature in that it expresses the thought that the PSC in approving the sale of Patuxent to Metropolitan should have imposed some type of condition subsequent on the contract which would have established safeguards against Patuxent's old customers being charged excessive rates.

We think this proposition is answered, as well it can be, in that portion of Commissioner Edmondson's dissent, wherein he states:

> "Therefore, from a legal standpoint this Commission cannot, after authorizing the discontinuance of the franchise by Patuxent, exercise any control over the rates charged by the Metropolitan Commission. The only way we can continue to exercise control over the rates and service of these customers is to refuse permission to Patuxent to discontinue the exercise of its franchise. In the long run there can be no question but what these services should be furnished by the Metropolitan Commission. However, at this time, it appears to be the expressed will of a majority of the public with whom we are statutorily concerned that this Commission exercise some control over the rates of the Metropolitan Commission. Accordingly, I am of the opinion that the public has the right and should have the opportunity to seek the assistance of their representatives in the State Legislature in having legislation considered for enactment at the next session of the General Assembly of Maryland that would carry out the wishes they have expressed to our Commission."

Judge Perrott, in the court below, was likewise not insensitive to the appellant's plight regarding exposure to unconscionable rates. He took pains to point out, however, that the appellant was not as bereft of a remedy as might be supposed, stating:

> "Appellants' next point as to the lack of re-

view over rates once the Public Service Commission loses jurisdiction is not as serious as appellants apparently fear. It is true that while the Public Service Commission has no review of the activities of the Metropolitan Commission and it is also true that there is no enunciated procedure for review of the decisions of Metropolitan in the governing statutes within the St. Mary's County Public Local Laws, the matter could easily be remedied by legislation, either by granting such review to the Public Service Commission, or, more consistent with the statutes, by granting the right of review to the St. Mary's County Board of Commissioners. Even so, until those or other such remedies are enacted, the Circuit Court for St. Mary's County has ample jurisdiction to pass on any question arising out of any activity of the Metropolitan Commission, which absolute jurisdiction cannot be divested unless and until the legislature makes other adequate provisions."

Judge Perrott's conclusion that the actions of Metropolitan would be subject to judicial review, should they appear to be arbitrary, is in keeping with the statement of Judge Oppenheimer, writing for this Court in *Truitt v. Board of Public Works*, 243 Md. 375, 221 A. 2d 370 (1966), when he noted:

"* * * This Court has consistently exercised its inherent power to review actions of administrative agencies alleged to be arbitrary or capricious even if there is no express statutory authority for such review. [citations omitted]" 243 Md. at 391.

*Decree affirmed, appellant to pay costs.*