## Richmond

## VIRGINIA ELECTRIC AND POWER COMPANY

### v.

## DIVISION OF CONSUMER COUNSEL, OFFICE OF ATTORNEY GENERAL AND STATE CORPORATION COMMISSION

April 18, 1980.

Record No. 791583.

Present: All the Justices.

*Evans B. Brasfield (Richard D. Gary; Hunton & Williams,* on brief), for appellant.

*Anthony Gambardella, Assistant Attorney General; Donald G. Owens (Marshall Coleman, Attorney General; Lewis F. Minter; Edward L. Flippen; Denton C. Roberts,* on briefs), for appellees.

I'ANSON, C. J., delivered the opinion of the Court.

In this appeal, Virginia Electric and Power Company (VEPCO) challenges the State Corporation Commission's disallowance of a fuel cost adjustment reflecting fuel costs incurred because of a shut-

down of the Surry Number 2 nuclear unit for 9.6 days in November 1977. The Commission determined that the shutdown was caused by a leak in a steam generator tube, that the energy replacement cost resulting from the outage was $4,696,766, and that the cost charged to Virginia jurisdictional customers through VEPCO's fuel adjustment clause was $3,287,736. The Commission ruled that VEPCO's evidence failed to support the reasonableness of the additional fuel costs incurred and ordered that $3,287,736 be refunded to Virginia customers in the form of a credit through VEPCO's 1979 fuel cost adjustment clause. Claiming that the Commission incorrectly applied the governing principles of law, VEPCO contends that the leak in the steam generator tube resulted from human error, rather than imprudent management. In addition, VEPCO asserts that the duration of the outage was dictated by an entirely independent problem, a leaking pressurized valve, and that it should be allowed to recover the fuel costs associated with this concurrent problem.

Subject to review by the Commission, electric utility companies are authorized to pass along to consumers increases in their fuel costs. *See* Code §§ 56-249.3, -249.4, and -249.6. Because nuclear energy is substantially cheaper than other sources for generating electricity, VEPCO and other electric utility companies attempt to maximize the use of their nuclear generators. Whenever nuclear generators are being serviced, VEPCO's fuel costs increase. These increases are reflected in its fuel adjustment clause.

Prior to 1977, VEPCO's Surry Nuclear Units 1 and 2 began experiencing a high number of forced shutdowns due to the denting and subsequent cracking of steam generator tubes because of corrosion of the tube support plates. These tube failures result in the leakage of radioactive coolant from the primary system of the generating unit into a non-radioactive secondary system. Such tube leakage requires a forced shutdown, at which time the defective tube is located and plugged to prevent additional leakage.

In conjunction with Westinghouse Electric Corporation, VEPCO devised a plan to avoid such tube failures. The developed program included a computer prediction of areas where tube failures would be likely and an instrument probe of only those areas.[1] In probing the tubes, field operators use an Eddy Current probe, which generates an

---

[1] An inspection of all steam generator tubes of a nuclear unit would have been a massive task. There are 3,388 U-shaped tubes for each generator, and three steam generators for each nuclear unit. Since each end of the tube must be inspected, a complete inspection of tubes for a single unit would require more than 20,000 separate checks.

electrical signal producing an oscilloscope picture recorded on magnetic tape. This signal is also recorded on a strip chart, on which field operators mark the identity of the probed tube. The tape and strip chart are then reviewed by an interpreter, who is responsible for determining whether further investigation of a tube is warranted. To minimize the duration of an outage, the interpreter works long hours during inspections. He reports his findings on an Eddy Current Test Sequence data sheet. Substantially dented tubes (those not allowing passage of a .610-inch probe) are then plugged, and slightly dented tubes (those not allowing passage of a .650-inch probe but allowing passage of a .610-inch probe) are scheduled for reinspection at the next scheduled shutdown.

In March 1977, pursuant to VEPCO's new inspection program, workers inspected the steam generator tubes at the Surry Unit Number 2. In September 1977, another inspection of the tubes at this unit was conducted, and the unit was brought back into service on October 12. On November 18, VEPCO was forced to shut down operations at Surry Unit Number 2 because of a leaking steam generator tube in its "A" generator. This unit was inoperative for 9.6 days. The leaking tube, R5C26 (row 5, column 26), had been probed in March 1977. Since that inspection revealed that this tube was slightly dented, it had been scheduled for reinspection in September. No inspection of R5C26 took place in September, however. Although no strip chart or oscilloscope trace existed for tube R5C26, the interpreter incorrectly noted that it had been examined and was determined to be "O.K." According to VEPCO's Director of Nuclear Operations, the interpreter "just probably was going too fast and it was a long day and he put down data that did not exist." A total of 6,144 tubes was scheduled for inspection in September; this total included 421 tubes examined in March and scheduled for reinspection because of the March probe results.

After the shutdown, VEPCO instituted a procedure for double-checking tube inspections. The new procedure involves a comparison of the strip charts and the Eddy Current Test Sequence data sheet. Furthermore, the new procedure also calls for greater scrutiny of tubes determined to be slightly dented.

■ Code § 56-249.4(B)[2] requires the Commission to "review

---

[2] Code § 56-249.4(B) provides in pertinent part: "The Commission shall hold quarterly hearings to review and evaluate the information filed pursuant to this section and § 56-249.3 and, thereafter, disallow any increased charges pursuant to an electric utility's fuel adjustment clause that cannot be supported by said information and the testimony filed at this quarterly hearing."

and evaluate" information concerning fuel cost adjustments and to disallow any increases that "cannot be supported" by testimony received at the quarterly hearings and by information submitted by the utility. The parties to this appeal agree that the Commission is empowered to disallow any expenses resulting from managerial inefficiency, waste, imprudence, or abuse of discretion. *See West Ohio Gas Co.* v. *Public Utilities Commission,* 294 U.S. 63, 72 (1935); *Norfolk* v. *Chesapeake, Etc., Tel. Co.,* 192 Va. 292, 311-13, 64 S.E.2d 772, 783-84 (1951).[3] VEPCO contends, however, that the Commission did not properly apply this principle in this case.

In its opinion of November 2, 1979, the Commission determined that, although VEPCO's management provided checks upon the work of the field operators conducting the Eddy Current probe, it failed to provide any safeguards against possible errors by the interpreter. The Commission noted that VEPCO produced no evidence indicating that the costs of providing such a safeguard were economically unfeasible. The Commission also determined that, in light of the severe economic consequences flowing from a single error by the interpreter, VEPCO's failure to provide a check upon possible interpreter error was an imprudent managerial decision.

VEPCO argues that the Commission should have considered the overall performance of the program designed to eliminate the problems associated with tube denting. The overall performance of the program, however, was not at issue. The issue before the Commission was whether VEPCO's management was imprudent in failing to provide a check upon the interpreter, who the company knew worked long hours and whose work was critical to the avoidance of costly shutdowns. The Commission could properly determine that VEPCO's failure to provide such a safeguard was an imprudent management decision even though the overall program had been successful in sharply reducing the number of forced shutdowns.

■ Whether additional fuel costs have resulted from imprudent management is a question of fact generally reserved for the Commission. The Commission's findings of fact are presumed to be correct; those challenging such findings must carry the heavy burden of demon-

---

[3] Recovery for fuel costs incurred in 1979 and subsequent years is governed by Code § 56-249.6, which was added in 1978. This section requires the Commission to consider "the appropriateness of all . . . fuel costs" and to "disallow recovery of any fuel costs that it finds without just cause to be the result of failure of the utility to make every reasonable effort to minimize fuel costs or any decision of the utility resulting in unreasonable fuel costs, giving due regard to reliability of service, economical generation mix, generating experience of comparable facilities, and minimization of the total cost of providing service."

strating that the Commission's ruling is contrary to the evidence or without evidence to support it. *Shenandoah S&L* v. *Front Royal S&L,* 220 Va. 718, 721-22, 261 S.E.2d 325, 328 (1980). Because VEPCO has failed to carry that burden, we affirm the Commission's ruling that VEPCO may not recover from its Virginia customers the additional fuel costs occasioned by the failure to provide a safeguard against interpreter error.

■ VEPCO also contends that the Commission erred in its calculation of the amount of the fuel costs resulting from the tube leakage. VEPCO argues that, although the tube leak "necessitated an outage . . . on November 18, 1977," a leak in a pressurized valve was a "separate and independent circumstance requiring the outage." VEPCO thus concludes that it should be allowed to recoup the replacement fuel costs associated with the entire outage.

In a report filed with the United States Nuclear Regulatory Commission (NRC) four days after the shutdown, VEPCO notified the NRC of the tube leakage and did not mention a concurrent cause of the shutdown. In VEPCO's quarterly fuel hearing before the Commission in March 1978, the Commission directed VEPCO to file a report on "the forced outage" at Surry Unit 2, including information concerning steps taken "to minimize the possibility of similar occurrences in the future" and "replacement energy costs associated with the outage." In a response dated March 31, 1978, VEPCO replied that replacement cost "associated with the forced outage of Surry Unit 2 for the period November 18-27, 1977 is $4,696,766." VEPCO's report addressed only measures taken to rectify the problem of tube leaks.

In the Commission's hearing held on June 25, 1979, VEPCO's Director of Nuclear Operations testified, however, concerning "[a]nother thing I might mention." The Director suggested that a pressurized valve leak, discovered three days prior to the tube leak, "in all probability" would have necessitated a shutdown "in a few days." The Director also testified that work on the valve leak began as soon as possible after the shutdown for the tube leak and that the outage would have lasted only 4.5 days if workers had solely remedied the tube leak. Prior to this time, no VEPCO official had indicated that there was a concurrent cause for the shutdown.

In its opinion, the Commission stated that it was faced "with conflict, or at least ambiguity," concerning energy replacement costs associated with the tube leak. It viewed the VEPCO report, which did not mention the valve leak, as inconsistent with the Director's testimony. The Commission concluded that it was fully warranted in

relying upon VEPCO's report dated March 31, 1978. VEPCO, on the other hand, argues that there is no conflict between the March 31 report and the Director's testimony. Further, VEPCO claims that it was not obliged to forward to the Commission information concerning the valve leak because the Commission's inquiry focused upon the tube leak only.

We agree with the Commission that there is an inconsistency between the March report and the Director's testimony. VEPCO's failure to mention in its report to the Commission that a valve leak was a concurrent cause of the forced outage and VEPCO's nineteen-month delay in mentioning the valve leak significantly undermine its claims. It is also significant that in setting forth measures taken "to minimize the possibility of similar occurrences in the future," VEPCO restricted its response to the tube problem. VEPCO claims, however, in its reply brief that the Commission's inquiry was "clearly directed to consideration of the steam generator inspection and plugging program." Since the scope of the Commission's inquiry was so clear, it was incumbent upon VEPCO to respond with equal clarity. VEPCO either should have confined its answer concerning "replacement energy costs associated with the forced outage" to the costs associated with the tube leak or should have noted that the forced outage resulted from a concurrent cause. In light of the clear focus of the inquiry, VEPCO's response can be properly construed as a claim that the costs occasioned by the tube leak amounted to $4,696,766. Although the Director's testimony was inconsistent with the March report, we cannot conclude that the Commission's finding of fact concerning the costs associated with the tube leak was "contrary to the evidence or without evidence to support it." *Shenandoah S&L* v. *Front Royal S&L,* 220 Va. at 722, 261 S.E.2d at 328 (1980).

For the reasons stated in this opinion, the Commission's order is

*Affirmed.*