60 Md. App. 495 (1984)
483 A.2d 796
PUBLIC SERVICE COMMISSION OF MARYLAND, ET AL.
v.
BALTIMORE GAS AND ELECTRIC COMPANY.
No. 178, September Term, 1984.
Court of Special Appeals of Maryland.
November 15, 1984.
Kirk J. Emge, Baltimore, for appellant, Public Service Com'n.
Gary R. Alexander, Oxon Hill, for appellant, People's Counsel, with whom was John K. Keane, Jr., Baltimore, on brief.
Valerie R. Watts, for amicus, Delmarva Power & Light Co.
Robert R. Winter, Hagerstown, for amicus, The Potomac Edison Co.
Edward A. Caine, William Dana Shapiro and Stephen G. Kozey, Washington, D.C., for amicus, Potomac Elec. Power Co.
H. Thomas Howell and John H. Mudd, Baltimore, with whom were Anthony W. Kraus, Semmes, Bowen & Semmes, Paul W. Davis and David A. Brune, Baltimore, on brief, for appellee.
Argued before BISHOP, BLOOM and GETTY, JJ.
BISHOP, Judge.
The Public Service Commission of Maryland (the Commission) and the People's Counsel appeal from orders of the Circuit Court for Calvert County which reversed, on appeal, two orders of the Commission denying Baltimore Gas and Electric Company (B.G. & E.) recovery of all of its replacement power costs for two separate power outages which occurred at B.G. & E.'s Calvert Cliffs nuclear generating plant. Md. Ann. Code, art. 78, § 91, 98 (1980, 1983 Cum. Supp.). The Commission had permitted 75% recovery in one of the cases and 25% in the other.[1] The Court directed the Commission to enter orders allowing B.G. & E. to recover the entire cost of replacement power for both outages. It held that by examining the two outages to determine whether they could have been avoided through better planning, preventive maintenance, more diligent efforts, closer supervision and more prudent management, the Commission exceeded its statutory authority to determine whether B.G. & E. had maintained the productive capacity of its generating plants at a reasonable level. We disagree. The principal question is one of statutory interpretation regarding the scope of the Commission's authority to determine fuel rate adjustments for electric companies under the Public Service Commission Law, Md. Ann. Code, art. 78, § 54F(f) (1983 Cum.Supp.).

I.

Procedural Background
In March of 1981, and again in February and March of 1982, B.G. & E. filed applications with the Commission to adjust its electric fuel rate. The February and March 1982 applications were consolidated into one case. The fuel rate is the separately stated prescribed amount per kilowatt-hour which an electric company charges its customers to recover its actual cost of fuel.[2] Md. Ann. Code, art. 78, § 54F(b) (1983 Cum.Supp.). It is subject to adjustment by the Commission pursuant to Section 54F(e) which provides that:
The fuel rate may be adjusted in accordance with this section only if the calculated actual fuel rate is more than 5 percent above or below the sum of the components of the fuel rate then in effect. An electric company having a decrease of more than 5 percent shall promptly file an application to adjust its fuel rate downward. To the extent that actual accumulated fuel costs are not recovered under this section, they may be deferred as an operating expense and be recovered in any base rate proceeding if the Commission finds that the costs were justified and recovery of the costs is consistent with the provisions of this article governing rates.
In each case, the Commission suspended the proposed rates for thirty days. Md. Ann. Code, art. 78, § 54F(c) (1983 Cum.Supp.). Thereafter, the Commission held public evidentiary hearings to determine whether:
(1) Only changes in the actual costs of the components of the fuel rate [were] included in the proposed change[s];
(2) The applicant has used the most economical mix of all types of generation and purchase;
(3) The applicant has made every reasonable effort to minimize fuel costs and followed competitive procurement practices;[3]
(4) The applicant has maintained the productive capacity of all its generating plants at a reasonable level.
Md. Ann. Code, art. 78, § 54F(f) (1983 Cum.Supp.). "The Commission may disallow ... [the proposed fuel rate if it is the] result of the applicant's failure to comply with the[se] requirements ... unless cause be shown to the contrary." Md. Ann. Code, art. 78, § 54F(g) (1983 Cum.Supp.). The burden of proving compliance is on the applicant. Md. Ann. Code, art. 78, § 54F(i) (1983 Cum.Supp.).
The disputed issues in this case were the standard to be used and the extent of the Commission's statutory authority to determine whether B.G. & E. had "maintained the productive capacity of all its generating plants at a reasonable level." Md. Ann. Code, art. 78, § 54F(f)(4) (1983 Cum.Supp.).

II.

Facts
In each case, B.G. & E. showed that its productive capacity was outstanding in comparison with that of nuclear power units of electric companies in the rest of the country. In fact, in 1980, the Calvert Cliffs plant set a new productivity record. Its availability factor, the percentage of time the plant was ready for or was actually in service, for the twelve month period ending January 31, 1981, was 81.61% as compared with 68.4% which was the expected industry average. In its order, the Commission acknowledged that B.G. & E. won an award "for the best operating record in 1980 of any commercial nuclear power plant in the United States."
In 1981, the Calvert Cliffs plant increased its output by 12% and set another plant record. Its availability factor was 83.1% as compared to the 68.4% expected industry average, and its capacity factor, the average load on the equipment compared to its rating, was the fourth highest among nuclear power units in the United States.
In each case, however, the People's Counsel presented evidence that particular forced outages could have been avoided by reasonable and prudent management designed to prevent employee error.
In both cases the Commission decided that the level of productive capacity and the fuel costs were unreasonable because the forced outages were unnecessary, since they were caused by imprudent managerial decisions. This concept was succinctly explained in B.G. & E.'s brief at page 4:
One fact which directly determines a utility's available sources of generation, and therefore its fuel rate, is plant outages. "Scheduled" outages of generating plants are planned in advance to facilitate maintenance work on equipment and the allocation of manpower. "Forced" outages occur at random, prompted by equipment malfunctions and other operational problems. In the event of any outage, replacement power must be obtained from a utility's own reserve units or purchased from another utility or the PJM Interconnection (whichever is least expensive). The cost of replacement power is then included in the calculation of the utility's fuel rate.
Outages at B.G. & E.'s Calvert Cliffs plant invariably necessitate the procurement of replacement power at a higher cost than the cost of generation at Calvert Cliffs. This higher cost results because nuclear energy is produced far less expensively than power from traditional, alternative fuels, such as coal and oil. The temporary increase in B.G. & E.'s fuel costs caused by an outage may necessitate adjustment of B.G. & E.'s fuel rate.
In December of 1980, at Calvert Cliffs Unit No. 1 a forced outage occurred near the end of the planned refueling and maintenance outage as the generator turbine was rolled in preparation for the resumption of operations. This seventeen day unplanned outage was caused by damage from a foreign object in the generator turbine  a standard 1/2" nut which, according to B.G. & E.'s own report, apparently fell from hoisting equipment used for maintenance procedures performed on the turbine during the planned outage.
The People's Counsel presented evidence that the presence of the nut from the maintenance equipment in the turbine was the result of negligence on the part of B.G. & E. Whitfield A. Russell, an engineer who specializes in utility matters, testified that because the company "did not carefully control access to its units nor inventory parts and equipment entering a secured area around the disassembled equipment," the Commission should not permit B.G. & E. to recover the cost of replacement power for that outage.
Another forced outage occurred near the end of a maintenance outage at Calvert Cliffs Unit No. 1 in July of 1981, after condensor tubes had been removed from the unit for testing. B.G. & E.'s own report concluded that the outage was caused by the failure of a B.G. & E. maintenance employee to replace one of the condensor tubes with a "dummy tube", or plug, when the condensor tube was removed for testing. As a result, when operations resumed with a start up of the unit on July 14, 1981, saline bay water leaked through the unplugged opening and contaminated the unit's feed water system. Because the leak was not detected until approximately ten hours later, the report also concluded that several acts and omissions on the part of B.G. & E. operations and chemistry personnel contributed to the severity of the outage. The incident caused a forced outage of approximately eight days.
The People's Counsel presented evidence that the bay water leak was the result of negligence on the part of B.G. & E. David Rosenbaum, an expert testifying on behalf of the People's Counsel, stated that the outage was the result of serious error in judgment and management and could have been avoided through better planning, more diligent efforts, closer supervision and more prudent management. Specifically, he stated that B.G. & E. did not have adequate inventory and inspection procedures in place with regard to tube replacements and that the situation was increased in severity because B.G. & E. did not (1) have adequate instrumentation on line during the unit's start up; (2) have a sufficient number of qualified chemistry technicians present; and (3) adequately train chemistry and operating personnel on the effect of gross salt water leakage. Accordingly, he recommended that the Commission disallow all replacement power costs associated with the outage.

III.

Commission Ruling
In each of these cases, the Commission held that B.G. & E. did not meet its burden of establishing that it had maintained the productive capacity of the Calvert Cliffs Unit No. 1 at a reasonable level because the company did not have adequate control, inspection and monitoring procedures in place which could prevent outages similar to those at issue. In view of the unit's high annual productive capacity as compared with the rest of the country, the Commission did not disallow the entire cost of replacement power for either outage. The Commission permitted B.G. & E. to recover 75% of its replacement power costs associated with the December 1980 outage caused by the 1/2" nut and 25% of that occasioned by the July 1981 outage caused by the missing plug.
The Commission applied the following standard:
Under the provisions of Section 54F(f)(4), an electric company has the burden of establishing that it "... has maintained the productive capacity of all its generating plants at a reasonable level." As we have stated in previous decisions, the first step in determining whether the requirements of Section 54F(f)(4) have been met is to measure the plant's performance on the basis of equivalent availability factors which take into account outages, partial outages and deratings. The productive capacity of the plant will be measured by a comparison of the performance for the most recent 12 month period against (a) the plant's own performance record averaged over the last three years, or (b) the availability factor, such as compiled by the North American Electric Reliability Council ("NAERC"), for similar size units, whichever is higher. If the plant's actual performance equals or exceeds the higher of the two standards, then there is a rebuttable presumption that the Company has complied with Section 54F(f)(4).
However, if the actual performance falls below the higher of the two standards or if evidence indicates that a specific outage or series of outages may be the result of imprudent management, the Commission will review the facts and circumstances surrounding the specific outages at the generating plant in question.
.....
[P]erfect performance is not possible nor required by Section 54F(f)(4). Therefore, an outage occasioned by human error is not a per se violation of this statutory standard. However, a decision must be made by the Commission as to whether the facts and decisions associated with the incident constituted mismanagement. In making this determination, the Commission will examine the extent to which the increased costs for replacement generation could have been avoided through better planning, preventive maintenance, more diligent efforts, closer supervision, and more prudent management. Specifically, in reviewing a particular outage, the Commission will examine whether the Company had instituted reasonable and appropriate procedures to prevent human error or equipment failure and to minimize the consequences of those occurrences. (Emphasis added).
.....
[I]f an electric company's procedures are found to be reasonable and appropriate, the company will be permitted to recover all of the replacement power costs which are incurred as a result of a forced outage. If the management procedures are found to be deficient, the Commission will consider the overall performance of the unit in making a determination as to whether or not the company should be allowed to recover replacement power costs. Under such circumstances, the Commission will consider the degree of management responsibility for the outage, as well as the level of performance which was experienced by the unit in question. However, if the outage is attributable to imprudent management and the plant's performance during the most recent 12 month period does not exceed the average availability factor as compiled by the NAERC for similar size units, the electric company will generally be precluded from recovering any of the replacement power costs associated with the outage.
B.G. & E. and the three electric companies which filed amicus briefs[4] contend that the Circuit Court properly held that the Commission exceeded its statutory authority under Section 54F(f)(4) by examining the facts and circumstances surrounding specific outages at the Calvert Cliffs generating plant. They argue that the Section contemplates an objective and periodic measurement of overall productivity, and that the Commission cannot justify its subjective investigation into the causes and responsibility for specific outages.
Appellants, the Commission and the People's Counsel, contend that the Commission has the authority to preclude an electric company from recovering replacement power costs which were incurred as a result of imprudent or unreasonable actions on the part of the company. They argue that by enacting Section 54F, the legislature intended that the Commission would subject the fuel rate costs to greater scrutiny, and that the Commission's finding that a portion of the replacement power costs which resulted from the outages should not be recovered from rate payers was not unlawful, arbitrary, capricious, or unsupported by substantial evidence.

IV.

Section 54F

A

Standard of Review
Section 97 of Article 78 states that:
Every final decision, order, rule or regulation of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be (1) in violation of constitutional provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole.
We summarized the standard of review in Public Service Commission v. Delmarva Power & Light Co., 42 Md. App. 492, 400 A.2d 1147, cert. denied 286 Md. 746 (1979).
The Court of Appeals has on many occasions noted that the decisions of the Commission are prima facie correct, and that the burden of proof is on the party seeking to set aside an order to show clear and satisfactory evidence that the Commission's decision is unreasonable or unlawful.
42 Md. App. at 499, 400 A.2d 1147.
B.G. & E. contends that the Commission's decision was unlawful because it exceeded the statutory authority granted by Section 54F(f)(4). See, e.g., Waller v. Public Service Commission, 265 Md. 111, 116, 288 A.2d 374 (1972). Specifically, it argues that a determination of whether a particular outage could have been avoided is plainly inconsistent with the language, context and legislative history of Section 54F(f)(4) which requires the Commission to determine whether the utility "has maintained the productive capacity of all its generating plants at a reasonable level."

B

Statutory Interpretation
The cardinal rule of statutory interpretation is to determine the intent of the legislature and to do this a court looks first to the language of the statute. Ryder Truck Lines v. Kennedy, 296 Md. 528, 535, 463 A.2d 850 (1983). If that language is ambiguous or unclear, a court must use other tools to discover the legislative intent or purpose. 296 Md. at 536, 463 A.2d 850.
The key phrase used in § 54F(f)(4), "reasonable level", is an ambiguous one since no standard is prescribed for determining what level is reasonable. The legislature chose not to define the phrase. In determining legislative intent, therefore, a court must read the language of the statute in context and in relation to all of its provisions, its legislative history, administrative interpretation and legislative purpose. Department of State Planning v. Hagerstown, 288 Md. 9, 14-15, 415 A.2d 296 (1980).

(1)

Legislative History and Purpose
Under Section 54F electric companies may recover only those fuel costs reasonably incurred within the meaning of the four factors identified in Section 54F(f), and those costs allowed under Section 54F(g) where, even though the applicant failed to comply with these requirements, there is cause to the contrary that it should recover.
Those factors are:
(1) Only changes in the actual costs of the components of the fuel rate are included in the proposed change;
(2) The applicant has used the most economical mix of all types of generation and purchase;
(3) The applicant has made every reasonable effort to minimize fuel costs and followed competitive procurement practices;
(4) The applicant has maintained the productive capacity of all its generating plants at a reasonable level.
In 1978, Section 54F implemented a procedure which replaced the "fuel rate adjustment clause" method by which electric companies had previously recovered their fuel costs. Under the former method, there was no separately stated fuel rate. Rather, using the fuel rate adjustment clause, an electric company was permitted "to automatically adjust its rate to reflect fluctuations in the cost of fuel from the level of costs included when base rates were established at a rate hearing procedure." Public Service Commission v. Baltimore Gas & Electric, 40 Md. App. 490, 492, 393 A.2d 193 (1978), cert. denied, 284 Md. 747 (1979). The procedure was designed to by-pass the delay caused by lengthy base rate proceedings in order to permit a more rapid recovery of the rapidly fluctuating fuel costs. Public Service Commission v. Delmarva Power, 42 Md. App. 492, 494, n. 1, 400 A.2d 1147, cert. denied, 286 Md. 746 (1979).
The use of this type of fuel rate adjustment clause had been authorized for a number of years. See, 1955 Md. Laws ch. 441; 1975 Md. Laws ch. 418; 1977 Md. Laws ch. 695. Initially, the fuel rate was subject to Commission review only at base rate proceedings. 1955 Md. Laws ch. 441. In 1975, however, the legislature required any electric company which passed on a change in the fuel rate to its customers to "verify and justify the adjusted fuel cost to the Commission" each month. 1975 Md. Laws ch. 418. The Commission was also authorized to hold public hearings when it deemed necessary. Id. Finally, the legislature provided that such public hearings would be held at least every six months. 1977 Md. Laws ch. 695. At those hearings, the Commission was required to
order a company to charge off and amortize, by means of a temporary decrease of rates any charges it finds were unjustified by determining that the company has improperly calculated the charge, has failed to use proper fuel procurement practices, or has used this charge to the detriment of the public.
Id.
Section 54F implemented a pre-adjustment review of proposed fuel rate changes by the Commission and was enacted in response to dissatisfaction with the fuel rate adjustment clause.
The FRA clause worked satisfactorily for a number of years, but the rapidly rising costs of oil imposed by the OPEC cartel and parallel increases in the cost of coal raised an understandable howl of protest which caused the Governor of Maryland, the members of the Legislature, citizens' groups and consumers to complain bitterly over the effect of the FRA on the spiraling cost of electric service in Maryland and throughout the country.
Delmarva Power, 42 Md. App. at 494, 400 A.2d 1147.
The preamble of the statute provides that it was enacted
[f]or the purpose of providing more definite standards for the Public Service Commission to evaluate whether fuel and purchased power rate adjustments are justified; providing for separate standards concerning electric companies that produce or generate power and whose gross annual revenues exceed $25,000,000; and generally relating to fuel and purchased power rate adjustments.
1978 Md. Laws ch. 173.
Under the new procedure, electric companies whose gross annual revenues exceeded $25,000,000 could no longer automatically adjust their rates to reflect fuel cost changes. Md. Ann. Code, art. 78, § 54F(a) (1983 Cum.Supp.). Rather, they could charge their customers a separately stated fuel rate which reflected the actual cost of fuel. Md. Ann. Code, art. 78, § 54F(b) (1983 Cum.Supp.). If this cost increased or decreased by more than 5%, an application was to be filed with the Commission for a change in the current fuel charge. Md. Ann. Code, art. 78, § 54F(e) (1983 Cum.Supp.). The Commission was to conduct public evidentiary hearings at which the applicant had the burden of establishing the four factors set out in 54F(f) in order to justify passing the cost on to the customer. Md. Ann. Code, art. 78, § 54F(f), (i) (1983 Cum.Supp.). The Commission is empowered to disallow the proposed fuel rate if the applicant fails to establish these factors unless contrary cause is shown. Md. Ann. Code, art. 78, § 54F(g) (1983 Cum.Supp.).
The issue of whether the Commission may make a subjective investigation of power outages at a generating unit in determining whether the electric company has "maintained the productive capacity of all its generating units at a reasonable level" as required by Section 54F(f)(4) may find some resolution in the actions of the legislature during the legislative session when that section was adopted.
In the process of choosing not to define "reasonable level", the legislature rejected bills which defined that standard in terms of statistical comparisons. Specifically, in 1978 the legislature did not adopt S.B. 1150 and H.B. 1823, both of which stated
... the Commission ... shall ... disallow recovery of any fuel costs that it finds without just cause to be the result of:
(2) failure of the utility to maintain the productive capacity of its generating plant at a level at least equal to the national power generating experience for comparable power facilities.
It would appear that the legislature rejected the very standard which B.G. & E. now suggests is contained in the statute.

(2)

Administrative Interpretation
In Comptroller v. John C. Louis Co., 285 Md. 527, 543-5, 404 A.2d 1045 (1979), the Court summarized the factors to be considered in relying upon the administrative interpretation of a statute.
In determining the proper weight to be accorded an administrative interpretation or practice, various factors must be taken into account. One of these factors is the consistency of the administrative interpretation or practice with the purposes of the statute. Still another is the thoroughness, breadth, and validity of the considerations underlying the administrative interpretation or practice. The method by which the agency established its interpretation or practice reflects varying degrees of study and evaluation of the particularized problem. Certain methods indicate less thoroughness and breadth than others. Thus, if an administrative interpretation has not resulted from a contested adversary proceeding, or from a promulgated administrative decision, rule, regulation, or departmental statement, it is entitled to relatively little weight. Similarly, if the administrative practice has not been publicly established, it is not entitled to substantial weight.
An additional significant factor is the consistency and length of the administrative interpretation or practice. Like an affirmative act, a failure to act can create inconsistency. When an agency fails to implement or enforce a statute in accordance with its own interpretation, it is acting inconsistently. Its failure to enforce diminishes the impact of the administrative interpretation.
285 Md. at 544-45, 404 A.2d 1045. (Citations omitted).
The history surrounding the Commission's interpretation of Section 54F establishes that its interpretation should be given careful consideration in our construction of the statute. The standard challenged by B.G. & E. is the product of an evolution in a line of fuel rate cases decided by the Commission dating back to 1978, the time that Section 54F was enacted. At oral argument, B.G. & E. did not object to this representation and stated that it had not judicially challenged the prior interpretations since they had not resulted in any monetary loss to B.G. & E.
In August 1978, as part of the Commission's initial implementation of Section 54F, it adopted the use of certain forms that the electric companies were required to use to report planned and forced outages to the Commission at the time of each major outage and on a monthly basis. Clearly, the Commission intended to investigate individual outages as part of its review of the fuel rate adjustments.
The first case involving a major consequence of outage reporting,[5] as it bears upon the standard at issue in this case, resulted in a May 1979 Commission order that
any outages which occur at lower cost generating plants will increase the total actual costs of fuel because relatively low cost generation has to be replaced with higher cost generation. The question posed by Subsection 54F(f)(4) is what are the standards and what does the Company have to prove in applications for adjustments to the fuel rate which are based upon increased fuel costs due to such outages.
The Commission adopted the following standard:
The inquiry has to be directed to what extent the increased costs for replacement generation could have been avoided through i.e. better planning, preventive maintenance, more diligent efforts, closer supervision and more prudent management. Such a finding can only be made if the performance of each individual plant is examined and cannot be based solely on the satisfactory performance level of the system as a whole.
In that same case, the Commission investigated an outage at Calvert Cliffs Unit No. 1, but B.G. & E. was apparently allowed to recover all of the replacement power costs associated with it. In at least five subsequent fuel rate adjustment cases, the Commission investigated particular outages and applied the standard announced in the 1979 case that a utility could not recover replacement power costs for outages attributable to the fault of the company.[6]
In short, from its initial action implementing Section 54F, the Commission indicated that in determining the reasonableness of productive capacity it would review the reasonableness of plant outages since they directly affected the level of productive capacity. This interpretation has been consistently applied by the Commission and is a reasonable one.
Although the interpretation placed upon the legislation by the administrative agency "is entitled to great weight as an administrative interpretation acquiesced in by the legislature, such an interpretation is not binding upon the courts", John C. Louis Co., 285 Md. at 543, 404 A.2d 1045; however, we reach the same conclusion based on our independent construction of the statute, infra.

C

Case Law
There are no cases construing Section 54F, and the Maryland statute is a unique procedure which has not been adopted in any other state.
This Court has decided two cases which involved the old fuel rate adjustment clause procedure. In Public Service Commission v. Baltimore Gas & Electric, 40 Md. App. 490, 510, 393 A.2d 193 (1978), cert. denied, 284 Md. 747 (1979), we held that the Commission had the authority to order a refund to customers because of an "overrecovery" of fuel rate adjustment charges by the utility under certain rate tariff supplements. In Public Service Commission v. Delmarva Power, 42 Md. App. 492, 400 A.2d 1147, cert. denied, 286 Md. 746 (1979) we upheld a Commission order requiring a refund for an overcharge under a fuel rate adjustment clause because the utility did not include certain test generated electricity from a new nuclear plant in calculating its total generation.
There are a number of cases from other jurisdictions which, under a fuel rate recovery procedure, considered the propriety of investigating particular forced outages in connection with whether electric companies replacement power costs could be recovered. For example, in State ex rel. Utilities Commission v. Virginia Electric and Power Co., 48 N.C. App. 453, 269 S.E.2d 657, 662 pet. for reh. denied, 301 N.C. 531, 273 S.E.2d 462 (1980), the Court of Appeals of North Carolina held that the Utilities Commission of that State may not consider plant efficiency as a factor for calculating the fuel rate under that State's statutory fuel cost recovery procedure. According to the Court,
By the clear and express language of this statute, the legislature has provided a procedure by which a public utility may apply to the Utilities Commission for authority to increase its rates and charges based solely upon the increased cost of fuel used in the generation of electric power and by which the Commission, on its own motion or upon request of an interested rate payor, may consider and determine a decrease in rates or charges based solely upon a decrease in the cost of fuel. The procedure provided is an expedited one "and shall not be considered a general rate case." (Emphasis added).
269 S.E.2d at 661.
The Court went on to state, however, that overall system efficiency, which depends upon management decisions should be considered in a general rate case.
Review of such management decisions by the Utilities Commission in a general rate case is not only entirely appropriate but even necessary, for poorly maintained equipment justifies a subtraction from both the original cost and the reproduction cost of existing plant before weighing these factors in ascertaining the present "fair value" rate base of the utility's properties as required by G.S. 62-133, and serious inadequacy of the utility company's service, whether due to poor maintenance of its equipment or to other causes, is one of the facts which the Commission is required to take into account in determining what is a reasonable rate to be charged by the particular utility company for the services it proposes to render.
269 S.E.2d at 662 (Citations omitted).
In interpreting the same statutory language, the Supreme Court of North Carolina in State ex rel. Utilities Comm. v. The Public Staff, 309 N.C. 195, 306 S.E.2d 435, 436 (1983) held that the cost of purchased power may not be recovered in a fuel cost recovery proceeding and that if such cost was recoverable the issue would be appropriate only in a general rate case. In that case, the Court stated
From our review of the language, purpose and history of the repealed G.S. § 62-134(e), we conclude that the Legislature intended that the Utilities Commission consider in the fuel adjustment proceedings only fluctuations in the price of fossil fuels  oil, coal and natural gas  used by the utility in the production of electric power in its own generating units. The Legislature did not intend to include in the expedited hearing proceedings the myraid of issues relating to purchased or interchange power which necessarily require closer scrutiny. Subsequent action by the Legislature in enacting G.S. § 62-133.2, which makes express provision for the consideration of such issues in the general rate cases, has now made its intent clear.
306 S.E.2d at 445.
These two cases are distinguishable from the case before us. It is clear from the language used by the Supreme Court of North Carolina in the VEPCO and The Public Staff cases that the increase or decrease in rates and changes was based solely upon fluctuations in the cost of fuel. Obviously, the North Carolina statute did not contain the four factors set out in 54F(f), supra. Also, it is clear from the language used in The Public Staff case that the legislature of North Carolina enacted legislation which now requires consideration of factors not required to be considered when these cases were tried.
More apposite to the case sub judice is Florida Power Corp. v. Cresse, 413 So.2d 1187 (1982), in which the Florida Public Service Commission prevented the Florida Power Corporation (FPC) from recovering all of its replacement power costs for a 167 day forced shutdown at a nuclear plant which resulted in the FPC's having to switch to more expensive fossil fuel generation. 413 So.2d at 1188. Recovery of $3.5 million was denied because the Florida Commission found that the shutdown had been extended by one week by FPC's failure to have a replacement decay heat pump on hand. Id. at 1188-89. The Supreme Court of Florida held, inter alia, that the Florida Public Service Commission did not improperly place the burden of proving the reasonableness of its fuel costs on the utility. Id. at 1190-91. According to the Court,
The requirement that utilities demonstrate the reasonableness of their fuel costs is not improper or unusual. "Burden of proof in commission proceedings is always on a utility seeking a rate change, and upon other parties seeking to change established rates." WELCH, CASES AND TEXT ON PUBLIC UTILITY REGULATION, 638 (Revised Edition 1968). FPC asserts that it provided proof of its fuel costs, that the same were incurred in the production of electric power for its customers, and that the reasonableness thereof was never questioned, and so that it was up to the PSC to show otherwise. That is not so. The data provided showed the FPC's fuel costs were significantly higher due to an incident the responsibility for which was in dispute. It was up to the utility, under those conditions, to show that the excess costs incurred were reasonable and were not the fault of management.
Id. at 1191.
This was a general rate adjustment case which does distinguish it from the case sub judice.
A similar result was reached in a fuel rate adjustment case by the Supreme Court of Virginia in Virginia Electric v. Division of Consumer Counsel, 220 Va. 930, 265 S.E.2d 697, 698, 701 (1980) which affirmed a Commission order disallowing recovery of a portion of the fuel cost adjustment which represented the replacement power costs for a 9.6 day shutdown at a nuclear plant. In that case, although the parties agreed that the Commission was "empowered to disallow any expenses resulting from managerial inefficiency,"[7] the electric company challenged the Commission's application of those principles to the facts of that case. 265 S.E.2d at 700.
The shutdown at issue occurred because of a leak in a steam generator tube which had not been inspected for leaks because of employee error, even though it had previously been scheduled for such an inspection. Id. at 699. According to the Court,
Whether additional fuel costs have resulted from imprudent management is a question of fact generally reserved for the Commission. The Commission's findings of fact are presumed to be correct; those challenging such findings must carry the heavy burden of demonstrating that the Commission's ruling is contrary to the evidence or without evidence to support it. Because VEPCO has failed to carry that burden, we affirm the Commission's ruling that VEPCO may not recover from its Virginia customers the additional fuel costs occasioned by the failure to provide a safeguard against interpreter error.
Id. at 700. (Citations omitted).

D

Conclusion
Section 54F was designed to permit the Commission to subject the fuel rate to greater scrutiny and regulation. The factors identified by Section 54F(f) were designed to guide the Commission in its determination of the types of costs which are reasonable and, therefore, properly passed on to the consumer.
The first of these factors limits the proposed fuel rate to changes in the actual costs of the components of the fuel rate. The next three factors provide tests for which of these costs are reasonable and should be passed on to the consumer: the applicant must use the most economical mix of all types of generation and purchase; it must make every reasonable effort to minimize fuel costs; and, finally, the increased fuel costs should not be allowed if the applicant has not maintained the productive capacity of all its plants at a reasonable level.
The Delmarva and Baltimore Gas & Electric cases demonstrate that the fuel rate was subject to rather detailed scrutiny by the Commission under the previous fuel rate adjustment clause proceedings. Section 54F was designed to intensify the examination given to the appropriateness of fuel rate adjustments. Cresse and Virginia Electric establish that inquiry into whether forced outages were the result of imprudent management are appropriate and that replacement power costs should be disallowed when unreasonable.
Forced outages which are unreasonable, i.e. are caused by imprudent management and planning, result in unreasonable fuel costs and unreasonable levels of productive capacity. None of the parties to this appeal have presented any evidence that the legislature intended that the Commission could use only objective standards in making a determination as to the reasonableness of the level of productive capacity. The subjective review employed by the Commission is appropriate for a fuel rate proceeding.
Based on our interpretation of the statute, Section 54F of Article 78, and having applied the standard review set out in Section 97 of Article 78, we hold that the actions of the Commission in these cases were neither unreasonable nor unlawful. Delmarva, 42 Md. App. at 499, 400 A.2d 1147.

V.

Rule Making
B.G. & E. contends that, by adopting the standard set out above, the Commission was adopting a "rule" and should, therefore, have followed the procedures set out by the State Documents Law, Md. Ann. Code, art. 41, § 256B et seq. (1982). This argument misconstrues the application of the State Documents Law which refers to the Administrative Procedure Act for a definition of "rule". Md. Ann. Code, art. 41, § 256B(f) (1982). There, rule is defined as
every regulation, standard, guideline, or statement of policy or interpretation of general application and future effect, including the amendment or repeal thereof, adopted by an agency, whether with or without prior hearing, to implement or make specific the law enforced or administered by it or to govern its organization, procedure, or in the practice before such agency, but does not include regulations concerning only the internal management of the agency and not directly affecting the rights of or procedures for adoption of rules issued pursuant to § 248 of this article, or declaratory rulings issued pursuant to § 250 of this article.
Md. Ann. Code, art. 41, § 244(c) (1982).[8]
In the case sub judice the Commission was not issuing a standard of general application and future effect; it was merely issuing a decision in a contested case pursuant to Md. Ann. Code, art. 78, § 85(a) (1980) which states that:
Every decision and order of the Commission in any contested proceedings shall be based upon a consideration of the record, shall be in writing and shall state the grounds for the Commission's conclusions.
As the Court stated in Liquor License Board v. Leone, 249 Md. 263, 270-71, 239 A.2d 82 (1968):
We are aware that in the field of administrative law, agencies may have duties which are quasi-legislative as well as quasi-judicial. This is a distinction which the APA [Administrative Procedure Act] recognizes by setting up different procedures to be followed in the promulgation of rules and regulations on the one hand and the hearing of contested cases on the other. (Citations omitted).

VI.

Sufficiency of the Evidence
B.G. & E. also asserts that it raised several other issues concerning the propriety and sufficiency of the Commission's findings which the Circuit Court found unnecessary to address and which would remain open in the event of a remand.
B.G. & E. neither supports this assertion by any reference to the 765 page joint record extract nor makes any request that the case be remanded. B.G. & E. does argue in its brief the factual basis used by the Commission in reaching its conclusion. We have reviewed the record and hold that there was substantial evidence to support the Commission's findings and that those findings were not arbitrary or capricious.

VII.

Apportionment of Fuel Costs
The argument of People's Counsel that once the Commission finds the replacement power costs unreasonable, and that the utility did not sustain its burden of proof, none of the resulting costs should be passed on to rate payers ignores the plain language of Section 54F(g):
(g) The Commission may disallow such increased costs as it finds were a result of the applicant's failure to comply with the requirements of this section, unless cause be shown to the contrary. (Emphasis added).
When the above subsection is read in the context of the section as a whole, it is obvious that the words "such increased costs" do not refer back to some "costs" previously mentioned in the section. Rather, they limit which (such) increased costs the Commission may disallow. The increased costs which may be disallowed are "such" increased costs resulting from the applicant's failure to comply with the requirements of the section. Under this subsection (g), the Commission in disallowing that part of the total increased costs attributable to a lack of compliance may at the same time allow such increased costs which are not attributable to the failure to comply.
This interpretation provides us with an explanation of the closing clause of subsection (g) "unless cause be shown to the contrary". The cause to the contrary why the Commission should not disallow all of the costs was B.G. & E.'s otherwise highly efficient operation of the nuclear unit. The Commission appeared to have concluded that the costs of the forced outages were kept as low as they were because of this highly efficient operation.
ORDER OF CIRCUIT COURT REVERSED; CASE REMANDED FOR THE ENTRY OF AN ORDER AFFIRMING THE ACTION OF THE PUBLIC SERVICE COMMISSION;
COSTS TO BE PAID 75% BY APPELLEE, B.G. & E. AND 25% BY APPELLANT, PEOPLE'S COUNSEL.
NOTES
[1] According to the B.G. & E., the costs not allowed by the Commission amounted to approximately $1,600,000 and $4,100,000, respectively.
[2] The fuel rate must be distinguished from the base rate. Under Section 68(a) of the Public Service Commission Law, the Commission has the authority to establish base rates which are "just and reasonable" for public service companies subject to its jurisdiction, such as B.G. & E. and other electric companies as defined by Section 2(f). "Just and reasonable" rates are defined by Section 69(a). The fuel rate, on the other hand, is a separately stated charge to the consumer which is based upon the cost of fuel. Fuel rates for "electric companies that produce or generate power and whose gross annual revenues exceed $25,000,000" are governed by Section 54F. Md. Ann. Code, art. 78, § 54F(a) (1983 Cum.Supp.).
[3] 1983 Laws of Maryland Chapter 157 added "taking into account the reliability of local transportation" at the end of this factor, (3).
[4] The Potomac Edison Company, the Potomac Electric Power Company and the Delmarva Power and Light Company are all subject to the Commission's jurisdiction and the provisions of Section 54F. They are, therefore, potentially affected by the resolution of the case sub judice.
[5] PSC 7238-B, Order No. 63804, May 29, 1979.
[6] PSC 7238-C, Order No. 63838, June 28, 1979; PSC 7238-D, Order No. 63925, August 29, 1979; PSC 7238-F, Order No. 64132, November 30, 1979; PSC 7238-H, Order No. 64285, April 30, 1980; PSC 7238-J, Order No. 64393, July 29, 1980.
[7] In a footnote to this statement, the Court refers to the statute which applied subsequent to this case. The factors identified by that statute are notably similar to the ones at issue here. The Court stated:

Recovery for fuel costs incurred in 1979 and subsequent years is governed by Code § 56-249.6, which was added in 1978. This section requires the Commission to consider "the appropriateness of all .. . fuel costs" and to "disallow recovery of any fuel costs that it finds without just cause to be the result of failure of the utility to make every reasonable effort to minimize fuel costs or any decision of the utility resulting in unreasonable fuel costs, giving due regard to reliability of service, economical generation mix, generating experience of comparable facilities, and minimization of the total cost of providing service."
265 S.E.2d at 700 n. 3.
[8] The Documents Law and the Administrative Procedure Act are now contained in the Md.State Government Code Ann. §§ 7-201 et seq.; 10-101 et seq. (1984), respectively. There, the term "regulation" has been substituted for "rule" to help distinguish between regulations of executive units and rules of judicial or legislative units. See, Section 7-201(h), 10-101(e) and Revisors Notes thereto.